J-S26001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.-M.N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 428 MDA 2025 |

Appeal from the Decree Entered February 26, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  132-AD-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 429 MDA 2025 |

Appeal from the Decree Entered February 26, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  133 AD 2024

BEFORE:  LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.:                **FILED: AUGUST 28, 2025**

C.W. (Mother) appeals from the decrees, entered in the Court of Common Pleas of Dauphin County Orphans' Court Division, involuntarily terminating her parental rights to her children,[1] A.-M.N.W. (born 10/2014)

---

[1] Mother has five other children in addition to Children.

and K.S.S. (born 6/2016) (collectively, Children).[2]  After careful review, we affirm.[3]

In June 2016, when K.S.S. was one-day old, Dauphin County Social Services for Children and Youth (CYS) received a general protective services (GPS) referral claiming that, at her birth, K.S.S. was suffering from substance abuse or withdrawal symptoms due to prenatal drug exposure.  In response to the referral, CYS implemented a safety plan that required Mother to submit to drug screens twice a week.  Between June 3, 2016 and July 19, 2016, Mother tested positive ten out of twelve times for phencyclidine (PCP) and one time for oxycodone.[4]  On July 19, 2016, Mother was hospitalized for attempted suicide by drug overdose.

On August 25, 2016, by court order, Children were removed from Mother's care and temporary legal custody of Children was granted to M.M., Children's grandmother and a safety plan resource.  Children lived with M.M.[5] until October 2022, when CYS received a second GPS referral alleging

---

[2] On April 14, 2025, our Court consolidated these appeals at 428 MDA 2025 and 429 MDA 2025 due to the fact that they involve related parties and issues. *See* Pa.R.A.P. 513.

[3] Children are half-siblings with different fathers.  J.S. is K.S.S.'s biological father and M.R. is A.-M.N.W.'s biological father.  M.R. voluntarily agreed to terminate his parental rights to A.-M.N.W. following the termination hearing. *See* N.T. Termination Hearing, 2/26/25, at 120.

[4] At the time, Mother had been prescribed oxycodone for pain.

[5] CYS supervisor Burston testified that Mother's home was in a deplorable state and that Children lacked medical care.  *Id.* at 23.

Children's half-sister had been sexually abused by members of M.M.'s household. M.M. was identified as a perpetrator by omission in the referral. Following a shelter care hearing held on October 10, 2022, the court entered an order removing Children from M.M.'s care and placing them in CYS' care and custody. From August 2016 through October 2022, Mother had minimal interaction with Children while they resided with M.M. *See* N.T. Termination Hearing, 2/26/25, at 56, 67.

Children were adjudicated dependent on October 19, 2022. CYS structured the following service plan for Mother: (1) obtain and maintain safe, stable, and sanitary housing for herself and Children; (2) ensure Children participate in active therapy; (3) follow all recommendations for services that will benefit Children; (4) attend all court hearings, CYS meetings, treatment plan meetings, and scheduled visits with Children; (5) notify CYS within 24 hours of new residence or new contact information; (6) sign all CYS information form releases; and (7) pay all support obligations. *See* Service Plan, 11/5/22.

In December 2022, Children were placed with their current foster family, who are both a kinship resource and pre-adoptive resource, with whom they continue to reside. Mother was granted supervised visitation with Children once every two weeks. A permanency review hearing, scheduled for February 2023, was continued due to Mother's hospitalization. On March 28, 2023, the court held a permanency review hearing that Mother attended and where the court determined Mother had moderately complied with the permanency plan,

but that Children's placement in kinship care remained necessary and appropriate. In April 2023, CYS started supervising weekend visits in Mother's home, with the intent to begin unsupervised visitation in the hope of reunification. However, in May 2023, CYS had concerns regarding the suitability of Mother's home where it was reported that the bathroom sink did not work, there were holes in a wall that permitted wild animals to enter the premises, and that Children's bookbags would be riddled with ants following visits at the home.[6] In July 2023, CYS investigated allegations regarding Mother's mental health and reports by Children's half-sibling that Mother wanted to commit suicide. Mother declined CYS' attempt to provide crisis stabilization services.

At an October 2023 permanency review hearing, the court determined M.M. was no longer a reunification resource and ordered Mother complete a psychological evaluation, with a parenting assessment, follow any recommendations from the evaluation and assessment, and complete a parenting program. At permanency review hearings held in January and July 2024, the court found Mother was minimally compliant with her permanency plan and, at an October 2024 permanency review hearing, concluded that Mother had been moderately compliant with her permanency plan.

_____

[6] A CYS casework supervisor testified that during the summer of 2023, Children often spent 5 consecutive days with Mother at her home overnight and unsupervised. *See* N.T. Termination Hearing, 2/26/25, at 45-46.

On November 22, 2024, CYS filed petitions to involuntarily terminate Mother's parental rights to Children on the basis of subsections 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[7]  On February 26, 2025,[8] the trial court held a termination hearing,[9] at which M.R., CYS Casework Supervisor Tiffany Burston, CASA Peter Forstmeier, kinship caretaker Jennifer Cleary, and Mother's current live-in boyfriend, A.W., testified.  Following the hearing, the

_____

[7] 23 Pa.C.S.A. §§ 2101-2938.

[8] The court appointed Gina Carnes, Esquire, as Children's guardian ad litem (GAL).  On March 21, 2023, the court appointed Peter Forstmeier as a Court Appointed Special Guardian (CASA) for Children.  A CASA "is an individual appointed by the court to participate as an advocate for a child who is dependent or alleged to be dependent."  **See** https://www.childwelfare.gov/resources/representation-children-child-abuse-and-neglect-proceedings-pennsylvania (last visited 7/24/25).  A GAL, who must be an attorney-at-law, represents the legal interests and the best interest of the child.  **Id.**

On March 21, 2025, Children's GAL filed a motion to be appointed as Children's legal counsel, noting that she determined, during the termination hearing that "she can and did represent both the best interests of the child . . . and the legal interests of the child . . . in the [] proceeding, and that the potential for conflict [between best interests and legal interest] did not exist."  CYS did not object to the GAL's appointment as legal counsel.  On March 24, 2025, the court granted the GAL's motion.  Although we do not condone the trial court's *post hoc* appointment of Attorney Carnes as Children's legal counsel, we conclude that it found that there was no conflict between Children's best interests and legal interests, and, thus, remand is not necessary.  **See In the Int. of H.H.N.**, 296 A.3d 1258 (Pa. Super. 2023) (where child's legal and best interests do not diverge in termination proceeding, attorney-GAL representing child's best interests can also fulfill role of attorney, appointed under 23 Pa.C.S.A. § 2313(a), to represent child's legal interests).

[9] At the time of the hearing, Mother was living with A.W. in a two-bedroom condominium.  **See** N.T. Termination Hearing, 2/26/25, at 101-02.  A.W. was working at Amazon and Mother was working at the Foot Locker Warehouse in Camp Hill.  **Id.** at 102-03.

- 5 -

court entered decrees involuntarily terminating Mother's parental rights to

Children pursuant to subsections 2511(a)(1), (2), (5), (8), and (b).[10]

_____

[10] A parent's rights to his or her child may be terminated after a petition has been filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.
>
>         \*     \*     \*
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.
>
>         \*     \*     \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) & (8).

Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal.  Mother presents the following issues for our consideration:

(1)	Did the trial court err when it involuntarily terminated Mother's parental rights under [subsections] 2511(a)(5) [and] 2511(a)(8), which explicitly reference removal from the parent, when the Children were not removed from Mother's care at the outset of [CYS'] involvement, but instead were removed from the care of another individual?

(2)	Did the trial court err when it involuntarily terminated Mother's parental rights under [subsection] 2511(a)(1) when [CYS] did not meet [its] burden of proof of clear and convincing evidence?

(3)	Did the trial court err when it involuntarily terminated Mother's parental rights under [subsection] 2511(a)(2) when [CYS] did not meet [its] burden of proof of clear and convincing evidence?

(4)	Did the trial court err when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that termination would have on the developmental, physical[,] and emotional needs of the minor as required by the Adoption Act, [subsection] 2511(b)?

Appellant's Brief, at 3.

Subsections 2511(a) and (b) of the Adoption Act set forth the grounds a petitioner must prove in order for the court to grant an involuntary termination of parental rights.  *See* 23 Pa.C.S.[A.] §2511.  Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination including, as is relevant herein, the requisite criteria for establishing parental abandonment pursuant to [s]ubsection 2511(a)(1).  *Id.* § 2511(a).  If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in [s]ubsection 2511(a), the court must then consider whether termination would best serve

"the developmental, physical and emotional needs and welfare of the child" under [s]ubsection 2511(b).[11

*In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021).  Under subsection(b), "the child's 'emotional needs' and 'welfare' include 'intangibles such as love, comfort, security, and stability.'" *In the Int. of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023).

"To determine whether the petitioning party has met [its] burden [under subsection (b)], the court must conduct a[n] analysis focused on the child." *Id.* at 1114 (citation omitted).  "The court must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.*  "Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.*

---

[11] Subsection 2511(b) states:

> **(b) Other considerations.**  The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6)[,] or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Instantly, the trial judge summarized his reasons for granting CYS'

petitions to terminate Mother's parental rights as follows:

These are always difficult and sensitive matters. And what I heard today in the testimony that was presented suggests to me that there is a mother who is making efforts to follow objectives but not following through on what is required after you check those boxes that you have done certain things for [CYS]. It is the internalization of those things that [CYS] is presenting as objectives that create a situation where a person is then able to parent better or at all based on not only accomplishing those objectives but internalizing what those objectives were designed to impart[] and that is the missing piece here. So[,] we could check a box and say that her, you know, completing the objectives has been, you know, minimal, substantial, whatever you want to say but the reality is it's almost been none because she has checked boxes but not done the things that have needed to be done to follow through with the information and the materials and the counseling and the treatment and all of those things that have been provided to her. And I believe her mental health is still lacking and there is a complete refusal to address the root cause of why she can't internalize the things that she needs to internalize to be able to parent better and to be able to just control herself in normal everyday life situations.

The information that is most troubling to me is this appears to be a cycle of involving men in her life and then involving them in her children's li[ves] and then having negative consequences occur which leaves her alone with a diminished ability to parent and no one to assist her in parenting.

And, you know, taking all of that into consideration based on the testimony that I have heard I am convinced that [CYS] has met its burden.

N.T. Termination Hearing, 2/26/25, at 119-20.

After reviewing the record, the parties' briefs on appeal, and applicable

statutes and case law, we find that CYS proved, by clear and convincing

evidence, that termination was proper under subsections 2511(a)(2)[12] and (b). While, on paper, it appears that Mother has completed the majority of her objectives under the permanency plan, her failure to implement recommendations and services offered to her demonstrates she lacks a protective capacity and her inability to parent Children. *See* N.T. Termination Hearing, 2/26/25, at 66 (CASA testifying there has been "[a] definite decrease in [Mother's] parenting abilities . . . in the last few weeks [that] indicates the wheels are falling off. She can't care for a single child [] under her supervision."); *id.* at 71-73 (Mother has exhibited no appreciable improvement in parenting behavior after receiving CYS services; Mother has been non-communicative, "fractious[, and] abrasive" with CASA).

Although Mother has been relatively compliant with her service plan objectives, *id.* at 14, Ms. Burston testified that Mother still does not have appropriate housing for Children,[13] she believes that Mother lacks the protective capacity to care for Children,[14] and she also testified that Mother

_____

[12] We need only agree with the orphans' court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

[13] Currently, Mother lives with A.W. in a two-bedroom condominium. A.W. testified that Mother is on the lease and that he is in the process of searching for a bigger home to buy. *Id.* at 110-112.

[14] Mother does not have a license to drive a car and does not own a car. However, A.W. testified that he lets Mother drive his car without a license. *Id.* at 109. A.W. also testified that he has a credit card "set up on a Lyft
*(Footnote Continued Next Page)*

- 10 -

still has unresolved issues that require continuing trauma-based therapy. *Id.* at 21; *see also id.* at 27-28 (Ms. Bruston testifying Mother has never, independently, paid for and lived in suitable housing with Children).[15] Overall, Mother has failed to "fully invest" in the services and programs that she completed as part of her permanency plan. Essentially, Mother is expending no effort to apply what she has learned to become a suitable parent who can advocate for the best interests of Children. *See id.* at 31 (Ms. Bruston agreeing with counsel that CYS has not seen improvement in Mother's ability to parent since inception of case); *id.* at 37 (Ms. Bruston agreeing with counsel that CYS has never seen Mother demonstrate ability to parent Children).

We, thus, conclude that the record supports the court's determination that termination is proper under subsection 2511(a)(2), where Mother has been unable to take the necessary steps to perform her parental duties which, in turn, have caused Children to be without essential parental care, and where the incapacity cannot or will not be remedied. *See In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) ("[p]arents are required to make diligent efforts

---

account so [Mother] just lets me know where she is going [and] I plug it into my app and take care of it." *Id.* at 111.

[15] Moreover, in response to questions by the trial judge, Ms. Bruston testified that there were pending charges against Mother for endangering the welfare of one of her other children, who had just been removed from her care, and that, within the past two weeks, two police reports had been filed against Mother alleging she was the perpetrator of domestic violence against A.W. *Id.* at 23. *See also id.* at 103-06 (A.W. testifying Mother "threw a punch" at him week before termination hearing and six months prior she "g[ot] loud and wild [so the] police [had] to come settle her down").

toward the reasonably prompt assumption of full parental duties") (citation omitted).

With regard to proving termination under subsection 2511(b), Ms. Burston testified that kinship foster parents, who are an adoptive resource, have bonded with Children and that Children feel secure in their foster home. *Id.* at 14. Moreover, one of Children's foster parents is A.-M.N.W.'s paternal aunt; Children's younger half-brother also lives with foster parents. *Id.* at 78. *See also id.* at 65 (CASA testifying: "[I]t is without a doubt in [Children's] best interest for [Mother's] parental rights to be terminated and for them to be adopted by [foster parents]."); *see generally id.* at 58-59 (CASA testifying Children thriving in foster home with regard to academics, involvement in extracurricular activities, and maintaining friendships); *id.* (Children "have been fantastic" since living with foster family; Children doing well physically, see doctors regularly, and mental health has significantly improved); *id.* at 80 (foster parent testifying K.S.S. has high levels of anxiety that requires structure and biweekly therapy). *Cf. id.* at 61 (CASA testifying K.S.S. "would be crying before a weekend with [Mother] because she was stressed and anxious about it").

Although both Children have expressed that they love Mother, *id.* at 74, they also "consistent[ly] and persistent[ly] . . . say 'when are we going to get adopted[?]'" by their foster family. *Id. See also id.* at 74-75 (15 months into case, Children expressed desire to be adopted); *id.* at 86 (foster parent testifying Children want to be adopted). Accordingly, both the CASA and a

CYS casework supervisor testified terminating Mother's parental rights would be in Children's best interests. *Id.* at 21, 65. *See K.T.*, 296 A.3d at 1114-15 ("an emotional bond' with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child and weighing the other factors present in the record") (citation omitted). *See* N.T. Termination Hearing, 2/26/25, at 65 (CASA testifying if Children were reunified with Mother "all the care and progress that [Children] have [now in their foster home] would simply evaporate. Not only would they be removed from the structure that is supporting them now, their friends, their family, their school, just that being torn away.").

In addition to examining the parent-child bond, a "trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014) (citation omitted). Accordingly, we conclude that the record support's the trial court's finding that terminating Mother's rights under subsection 2511(b) is in Children's best interests.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/28/2025</u>